IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 6, 2018

**WILLIE JONES v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 12-05666     James Lammey, Judge**

_____

**No. W2017-01960-CCA-R3-PC**
_____

The Petitioner, Willie Jones, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief from his 2014 convictions for second degree murder and being a convicted felon in possession of a firearm and his effective twenty-nine-year sentence. The Petitioner contends that he received the ineffective assistance of counsel. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Patrick Stegall, Memphis, Tennessee, for the appellant, Willie Jones.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Amy P. Weirich, District Attorney General; and Leslie Byrd and Stephanie Johnson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's convictions relate to the October 2012 shooting death of his wife, Melody Shawnee Jones. The Petitioner appealed his convictions, and this court affirmed the convictions and summarized the facts of the case as follows:

The State's proof at trial showed that on the evening of April 27, 2011, Memphis Police Department ("MPD") Officer David Rowsey was dispatched to . . . a "shot fired" call. The defendant answered the door when Officer Rowsey and his partner, Officer Walker, arrived at approximately 11:00 p.m. The defendant stated that he had shot his wife and directed the officers to an upstairs bedroom, where Officer Rowsey discovered the body of the victim

lying in a pool of blood. On cross-examination, Officer Rowsey clarified that the defendant had stated, "'You need to help me, I shot my wife by accident.'"

Derrick Delancy, a firefighter paramedic with the Memphis Fire Department, also responded to a call to the defendant's residence. Upon entering the residence, Mr. Delancy found the victim lying "in a big puddle of blood." While working to save her, Mr. Delancy noticed a handgun on the bed nearby and requested that MPD officers secure the firearm.

Lyrics Harlmon, the victim's brother, was awakened by multiple telephone calls between 10:30 p.m. and 10:46 p.m. on April 27. Mr. Harlmon then received a text message from his mother asking him to "call her ASAP." After speaking with his mother, Mr. Harlmon proceeded to the victim's residence. After he arrived, he listened to a voicemail left on his cellular telephone at 10:46 p.m., and he heard the voices of the defendant and the victim. After listening to the message, Mr. Harlmon gave the telephone to MPD officers on the scene. Through the testimony of Mr. Harlmon, the State entered into evidence a recording of the voicemail message, which was received from the defendant's telephone. On the recording, a man and a woman, identified by Mr. Harlmon as the defendant and the victim, can be heard arguing. Over the course of the four-minute recording, the arguing escalates as the defendant begins cursing at the victim and the victim tries to reason with him, asking, "Why are you doing this?" and "Why would you do that to your damn children?" The arguing stops and, after nearly 20 seconds of silence, the sound of a single gunshot is audible. A few seconds later, the defendant can be heard saying, in an even tone, "Shawnee," just before the recording ends.

On cross-examination, Mr. Harlmon insisted that he heard the victim state on the audio recording, "'[W]hy are you pointing the gun at me," and that he informed officers on the scene of the victim's mention of a gun. Mr. Harlmon also testified that he told officers that "it sounded like I may have heard a gun go off."

MPD Officer Lee Walker with the crime scene division photographed the crime scene on April 27, and through Officer Walker's testimony, the State introduced into evidence those photographs. Based on conversations with other officers on the scene, Officer Walker was under the impression that the defendant had been cleaning his handgun when it fired, striking the victim. Officer Walker searched for items that would typically be used to clean a firearm and found none. Officer Walker photographed the handgun lying on

the bed in the upstairs bedroom, then removed the ammunition from the weapon and catalogued both the ammunition and the firearm.

Tennessee Bureau of Investigation ("TBI") Special Agent and forensic scientist Cervinia Braswell [testified] as an expert in firearms identification. Agent Braswell examined the weapon recovered from the crime scene, a .22 caliber revolver, as well as one spent cartridge case and six live cartridges. After test-firing four of the cartridges and examining the spent cartridge case from the crime scene, Agent Braswell determined that the cartridge case had been fired from the subject revolver. Agent Braswell also examined the bullet recovered from the medical examiner, but the damage to the bullet was too extensive for her to determine whether it had been fired from the revolver. Agent Braswell's examination of the victim's shirt revealed that the distance between the shirt and the muzzle of the revolver was less than 18 inches.

Marla Clark, the victim's cousin, testified that she paid the victim to transport her child to and from school. One week prior to the victim's death, the victim told Ms. Clark that "she was tired of the situation and that she wanted a divorce and [the victim and the defendant] had agreed to . . . separate." On the morning of April 27, Ms. Clark contacted the victim and asked if she was "ready for the gas money." The victim responded in the affirmative, explaining that the money was needed because the only money she had at that time was needed to pay for car insurance.

MPD Sergeant Eric Jackson responded to a domestic violence call at the residence of the defendant and the victim on August 27, 2009. When the victim placed the 9-1-1 call, she had explained that she "was involved with a physical altercation with" the defendant and that "she was calling in secret" because she did not want the defendant to know she had contacted the police. When Sergeant Jackson arrived at the residence, he observed injuries to the victim's neck and arm. Sergeant Jackson and his partner determined that the defendant was the primary aggressor and placed him under arrest.

A.H.J., the 12-year-old daughter of the defendant and victim, testified that, when she was five years old, she recalled that the victim was awake late at night waiting for the defendant to return home. Because A.H.J. could not sleep, she sat with the victim in the living room. When a truck arrived outside the residence, the victim instructed A.H.J. to return to her room. A.H.J. overheard the victim tell the defendant to "tell that trick to come inside," followed by arguing among the victim, the defendant, and another woman. After the woman left the house, A.H.J. heard her parents continue to argue,

-3-

and she heard "banging and loud noises against the wall" while her mother "would scream and cry."

When A.H.J. was six or seven years old and in the first grade, she was practicing baton twirling in her room when the defendant returned home "drunk" with "a brown bag with a bottle in it." The defendant took the baton from A.H.J. and began "bopping" A.H.J., the victim, and A.H.J.'s 17-year-old brother on the head with it. A.H.J., believing the defendant was just "playing," chased after the defendant to retrieve her baton. The victim asked the defendant to stop, stating that she knew he was "hitting [her] harder than" he was hitting the children. The defendant then stopped and punched the victim in the face.

When A.H.J. was in the second grade, she witnessed the defendant ask the victim for the family's gasoline discount card. The victim asked the defendant where he intended to go, and the defendant replied that it was none of the victim's business. When the victim refused to turn over the card, the defendant attempted to grab it from the victim's handbag, and the victim accused him of stealing. The defendant then began beating the victim repeatedly. A.H.J. attempted to call 9-1-1, but the defendant knocked the telephone from her hand and told her to go to her room. A.H.J. then tried to access 9-1-1 through a computer, but the defendant appeared and knocked the computer away from her while the victim "was just crying."

The following year, the victim decided to force the defendant to move out of the family's residence. A.H.J. encountered the defendant in the living room, packing his belongings, and A.H.J. asked the defendant to say a prayer with her. The defendant refused and told A.H.J. to "pray with [the victim] because she need[ed] it the most."

At the age of nine, A.H.J. moved to the Royal Oaks residence with her parents. Shortly thereafter, A.H.J. recalled an incident when she could hear "bumping against the wall and [the victim's] screaming and crying." Realizing that her parents were "fighting" again, A.H.J. attempted to call 9-1-1, but she did not know the address. The defendant's friend, known as Bologna, was visiting at the time, and A.H.J. asked him to "go outside and tell me the address." When Bologna realized that A.H.J. was contacting the authorities, he took the telephone from her and ended the call.

-4-

Approximately one week before the victim's death, A.H.J. overheard her parents arguing in their bedroom. A.H.J. heard the defendant tell the victim that "'one day you ain't going to be here.'"

Doctor Karen Chancellor, forensic pathologist and chief medical examiner for Shelby County, performed the victim's autopsy. Doctor Chancellor determined that the cause of the victim's death was a gunshot wound to the chest, and the manner of death was homicide.

With this evidence, the State rested. Following a *Momon* colloquy and the denial of the defendant's motion for judgments of acquittal, the defendant elected to testify and to present proof.

Officer Kevin Covington with the MPD Felony Response Bureau testified that he took a statement from Mr. Harlmon on April 27 and that he did not recall Mr. Harlmon's stating anything about a gun or a gunshot.

The defendant testified that he and the victim had been in a relationship for 20 years at the time of her death. He admitted that they "argued a lot" and "fought a lot" and that they would occasionally "break up for a while." The defendant denied ever bringing another woman to the residence he shared with the victim, and he did not recall the incident with the baton. When asked if he had ever struck the victim, the defendant responded that he and the victim "had a lot of physical altercations." With respect to A.H.J.'s testimony about the gasoline discount card incident, the defendant admitted to pushing the victim, causing her to fall over a recliner, but he denied beating her. The defendant denied ever "smack[ing] a computer out of" A.H.J.'s hands and insisted that he had never been abusive to his children. The defendant also denied ever telling the victim, "'[Y]ou're not going to be around.'"

When asked about the voicemail recording that had been entered into evidence, the defendant explained that he had been angry at his brother for erasing the telephone numbers that had been saved in his cellular telephone. The defendant stated that the victim was asking him "why I'm acting like that, it ain't her fault." The defendant testified that he and the victim then began arguing about money because the victim "didn't want to tell [him] how much money she had." The victim told the defendant "she was fixing to count her coins," and, according to the defendant, the argument ceased. The victim was cleaning up the bedroom while the defendant drank a beer.

When he finished his beer, the defendant asked the victim for his gun. The victim told him that the gun was inside her purse. The defendant testified that he retrieved the gun and that it was "already cocked from the night before." He explained that he routinely slept with the firearm cocked in order to protect the house from an intruder. The defendant stepped into the bathroom to wash his hands and told the victim that he planned to go outside to shoot his gun. As the defendant was standing in the doorway of the bathroom, he attempted to uncock his weapon. Because his hands were still wet, his thumb "slipped off the hammer" and the gun "fired," striking the victim. The victim called the defendant's name, and he "could tell by the panic in her voice that something was wrong." The defendant then threw the gun onto the bed and contacted 9-1-1. The 9-1-1 recording, which was admitted into evidence and played for the jury, indicated that the call was placed by the defendant at 10:50:31 p.m. The defendant denied that he had intended to shoot or kill the victim.

The defendant admitted that he was a convicted felon and that, as such, he should not have had a handgun in his possession.

*State v. Willie Jones*, No. W2014-02428-CCA-R3-CD, 2016 WL 7742751, at *1-4 (Tenn. Crim. App. Apr. 6, 2016).

The Petitioner filed the instant petition for post-conviction relief, alleging multiple instances of ineffective assistance of counsel. On appeal, the sole basis for relief is related to trial counsel's alleged failure to impeach Lyrics Harlmon, the victim's brother, relative to an inconsistent statement regarding the voicemail recording. Our recitation of the post-conviction proof is limited to this issue.

At the post-conviction hearing, the Petitioner testified that his trial testimony showed he shot his wife when he tried to uncock a firearm. He said that the shooting was accidental, that his thumb slipped off the gun's hammer, that the gun fired, that she was shot in the chest, and that he called 9-1-1 and administered CPR. He said that on the night of the shooting, he called Mr. Harlmon to purchase marijuana, that he thought he ended the call when the conversation ended, and that he placed the phone in his pocket. The Petitioner said that Mr. Harlmon testified at the trial that he received a voicemail recording from the victim and that he heard an argument and a gunshot. The Petitioner said that a police officer testified at the trial that Mr. Harlmon never reported to the officer about hearing a gunshot. The Petitioner said that trial counsel attempted to question Mr. Harlmon but "never really said nothing about [it] afterwards."

-6-

The Petitioner testified that he and the victim lived in a violent neighborhood and that he kept a cocked handgun under their bed. He said that on the night of the shooting,

> When I was talking to my wife, her niece and my daughter were in the room. So, on the phone call I tell her to get the gun, I also tell her to uncock it, but I said don't uncock it, just put it up and I'll get it when I get home. . . . that's how I even came in touch with the gun, trying to uncock the gun. . . . People think they hear a[n] argument, so they just automatically think [I] tried to kill her. Well, no, that's not the situation. It just happened to be a coincidence that we got to arguing while I'm uncocking a gun and it discharged.

On cross-examination, the Petitioner testified that on the night of the shooting, he washed his hands and attempted to uncock the gun while his hands were still wet. He agreed that Mr. Harlmon testified that he heard a gunshot in the voicemail recording and that trial counsel cross-examined Mr. Harlmon but did not question him about his inconsistent statement to the police, which did not include Mr. Harlmon's stating he heard a gunshot in the recording. The Petitioner agreed that counsel called as a defense witness the officer who spoke to Mr. Harlmon and that the officer testified that Mr. Harlmon never mentioned hearing a gunshot.

The Petitioner testified that the voicemail recording was played for the jury, and he agreed this court reviewed the recording during the appeal of his conviction. He denied hearing a gunshot in the recording. He agreed, though, that the jurors heard the recording and determined for themselves whether it contained a gunshot.

Trial counsel testified that she received her law license in 1994 and that her area of practice was criminal defense. She recalled Mr. Harlmon's trial testimony and stated that the voicemail recording was not a message but rather a recording of what occurred inside the Jones home on the night of the shooting. She said the recording was played "a number of times" during the trial. She said that Mr. Harlmon testified that he heard gunshots in the recording. When asked whether a gunshot could be heard in the recording, she stated

> there's a noise toward the end. I never thought it sounded like a gunshot because you can hear voices and to me, if you're going to hear a gunshot go off, it should shock you, you should go oh my gosh. It should be so very, very loud. I didn't think it was loud enough to even sound like a gunshot, but I guess the jury disagreed with me.

Trial counsel testified that during the defense's case-in-chief, she presented Memphis Police Officer Kevin Covington, who testified that Mr. Harlmon did not report hearing gunshots in the recording when Mr. Harlmon mentioned the cell phone.

-7-

On cross-examination, trial counsel testified that she reviewed this court's opinion in the appeal of the convictions and agreed that she cross-examined Mr. Harlmon and presented Officer Covington's testimony relative to whether Mr. Harlmon ever reported hearing a gunshot in the recording. She said that the defense could "get the information we wanted without having to argue with a witness and . . . from somebody that works for the State."

In the written order denying relief, the post-conviction court incorporated its findings and conclusions from the bench at the conclusion of the evidentiary hearing. The court found that trial counsel "attempted to do everything," that the trial court ruled against counsel, and that counsel did not "make any errors." The court found that the Petitioner failed to show that counsel's performance prejudiced his right to a fair trial. The court said that counsel provided "advice and services that were within the range of competence demanded of an attorney in a criminal case" and that the Petitioner "was less than candid with the court" during his post-conviction testimony. The court determined that the Petitioner failed to establish his ineffective assistance of counsel claim. This appeal followed.

The Petitioner contends that the post-conviction court erred by denying relief. He argues that trial counsel provided ineffective assistance by failing to question thoroughly Mr. Harlmon about the discrepancy between his police statement and his trial testimony relative to whether he heard a gunshot in the voicemail recording.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993); *Hill v. Lockhart*, 474 U.S. 52 (1985). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the deficient performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The record reflects that at the trial, Mr. Harlmon testified that he gave his cell phone to police officers and that the cell phone contained a voicemail recording reflecting the events inside the home in which the shooting occurred. During cross-examination, trial counsel asked Mr. Harlmon, "And you didn't mention hearing a gunshot to the officers that night?" The State objected, and a bench conference was held in which counsel and the prosecutors discussed whether the question was for impeachment purposes or was intended to elicit inadmissible hearsay evidence. Counsel was permitted to ask the question again, and Mr. Harlmon stated that he told the police officers "it sounded like I may have heard a gun go off." On redirect examination, Mr. Harlmon was provided his written police statement in order to refresh his recollection relative to the Petitioner's cell phone number. On recross-examination, counsel asked Mr. Harlmon if he discussed in the written statement whether the victim stated in the recording that "there [was] a gun." The State objected on the basis that counsel's question went beyond the scope of recross-examination, and the trial court sustained the objection.

Trial counsel questioned Mr. Harlmon about the inconsistency regarding whether he reported to the police that he heard a gunshot in the recording. Counsel testified at the post-conviction hearing that she presented Memphis Police Officer Kevin Covington as a defense witness to refute Mr. Harlmon's testimony rather than to argue with Mr. Harlmon about what he told the police at the time of the shooting. Officer Covington testified at the trial that he obtained Mr. Harlmon's statement at the time of the shooting and that Officer Covington did

-9-

not recall Mr. Harlmon's stating anything about a gun or gunshot. Counsel made a strategic decision not to argue with Mr. Harlmon, who was the victim's brother, about whether he heard a gunshot in the recording and whether he reported hearing a gunshot to the responding police officers. The jury was presented with evidence that Mr. Harlmon did not report hearing a gunshot in the recording, and the jury evaluated Mr. Harlmon's credibility on this point.

Furthermore, trial counsel testified that the recording was played "a number of times" during the trial. The jury heard the recording, and it determined whether it contained a gunshot. This court summarized the contents of the recording in its opinion affirming the Petitioner's convictions and concluded that the arguing ended, that twenty seconds of silence followed, and that "the sound of a single gunshot [was] audible." *Willie Jones*, 2016 WL 7742751, at *1. The record supports the post-conviction's determinations that the Petitioner failed to establish counsel provided deficient performance and to show that any deficiency resulted in prejudice to the Petitioner. He is not entitled to relief on this basis.

Based upon the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE